## HAMMONTREE

v.

## EDISON BROS. STORES, Inc.

### No. 21952.

Kansas City Court of Appeals.

Missouri.

June 14, 1954.

Jack G. Beamer, Stubbs, McKenzie, Williams & Merrick, Kansas City, for appellant.

Reed O. Gentry and Rogers, Field & Gentry, Kansas City, for respondent.

BOUR, Commissioner.

Chet Leon Hammontree, a minor, by Mrs. Patricia Mae Hammontree, his mother and next friend, brought this action to recover damages for personal injuries alleged to have been sustained by him in a store operated by the defendant corporation. A trial resulted in a verdict for plaintiff in the sum of $1,000 and judgment was rendered accordingly. Defendant filed a motion to set aside the verdict and judgment and to have judgment entered in accordance with its motion for a directed verdict filed at the close of all the evidence, and in the alternative a motion for a new trial, as provided by Section 510.290 RSMo 1949, V.A.M.S. The court sustained the first-mentioned motion, overruled the motion

for a new trial, set aside the verdict and judgment for plaintiff, and entered judgment for defendant. Plaintiff has appealed.

Plaintiff was one and one-half years of age at the time of the accident and about four at the time of the trial. Three witnesses testified for plaintiff; namely, Mrs. Hammontree, plaintiff's mother, Mrs. Lillian Roles, plaintiff's maternal grandmother, and Dr. Edward P. Altomare. By agreement of the parties, Dr. Altomare's testimony was omitted from the transcript. Defendant called no witnesses.

The record shows that at all times here material, the defendant, Edison Brothers Stores, Inc., operated a retail store known as the Baker Shoe Store and located on the west side of Main Street, between Tenth Street and Eleventh Street, in Kansas City, Missouri. Plaintiff's Exhibits 1, 2 and 3 and defendant's Exhibits 4 and 5 are photographs of the front entrance to defendant's store which were taken after the accident occurred. These photographs were taken from the interior of the store with the camera pointing towards Main Street. They were admitted in evidence without objection, after plaintiff's mother testified that they correctly represented the conditions existing at the time of the accident.

The evidence showed that the front entrance to the store consisted of two swinging doors set back about twenty feet from the sidewalk on Main Street. The sidewalk runs north and south. There was a display window on each side of a passage which led from the sidewalk to the double doors. The doors turned on pivots which fitted into sockets in the sill and head. They were pivoted on opposite sides and between what might be called the pivot side of each door and the nearest display window was a stationary, perpendicular panel or door jamb. Mrs. Hammontree testified that these panels were "more than a foot" in width. Each door and each panel consisted of a single piece of thick, transparent glass, with metal strips or framework extending along the upper and lower

edges. Each door was equipped on the inside with a metal bar or handle marked "Pull". In order to clarify the facts in this case, we set forth below a copy of plaintiff's Exhibit 3 and a copy of defendant's Exhibit 4.

Exhibit 4

Exhibit **3**

As indicated above, the photographs identified as Exhibits 3 and 4 were taken with a camera located inside the store. Exhibit 4 shows the entire front entrance. In this view of the entrance the south door is seen at right center. Exhibit 3 shows the lower parts of the south door and adjacent panel. The sheets of white paper which appear in Exhibit 3 were evidently fastened on the door and panel by the photographer. When both doors were standing in a closed position, as in Exhibit 4, there was a narrow clearance space between them. Since the doors moved on pivots, there was a narrow clearance space between each door and the adjacent panel when the doors were closed. When one of the doors was opened the space between the door and the stationary panel widened. Exhibit 3 shows the south door standing almost half-open. There was no testimony as to the exact width of the open space between the door and the panel when the door was in that position. It is apparent, however, that the space was at least an inch in width. Plaintiff claims that while he was in the shoe store as an invitee, his left ring finger was caught and crushed between the south door and the south panel.

On April 20, 1950, the day of the accident, plaintiff and his brother were taken by their mother and grandmother to defendant's shoe store. Plaintiff's brother was four and a half years of age at the time. Mrs. Hammontree, the mother, testified in part as follows:

"Q. What was the purpose of your shopping trip? A. Well, we were going to find my mother some shoes. * * * I found my size at Baker's all the time, * * * that is the reason I took my mother. * * *

"Q. When you went in the store on April 20th with your mother and two boys what did you do? A. Well, we walked towards the back of the store and looked at some shoes that were on display there and after we looked at them a little bit, we sat down * * *.

"Q. That was at the back of the store? A. Yes, sir.

"Q. Were the two boys with you at that time? A. When we went in the store they walked toward the back with us and as near as I know—I mean I didn't know when the young one left, Chet Leon. * * *

"Q. When did you next observe Chet? A. Well, mother and I were talking about the shoes, I glanced around and didn't notice him by us, the older boy Troy was standing by us. I noticed the youngest one toward the front of the store and I sent Troy, the older boy, up toward the front to tell his brother to come back where we were.

"Q. Did Troy then go up toward the front of the store? A. Yes, sir.

"Q. Then what was the next thing you know about this occurrence? A. It seemed immediately after I sent him up there—I don't know whether it was immediately—mother and I were talking and just out of a clear sky my youngest let out a scream. As soon as he let out the scream I jumped up to see what was the matter. He had started back toward me so I run to the front of the store to pick him up.

"Q. At that time did you see any people up toward the front of the store? A. Yes, sir, there were people at the front of the store. There was a lady behind the hosiery counter, a couple, oh, there was two or three men at the front of the store, salesmen.

"Q. Where were they standing in relation to the front door? A. Well, they would be standing on the north, toward the north.

"Q. How far back in the store were they standing? A. Oh, I don't know, maybe it would take them five or six or eight steps to get to the door.

"Q. Then what did you do when you saw or heard Chet scream and come back towards you? A. I picked the child up of course immediately to see what was the matter. * * * I

saw blood on his left hand. * * * I noticed the (left ring) finger was awfully limp. * * * It looked like the end was cut completely through from the top down.

"Q. About where was the cut? A. Above the fingernail, between the fingernail * * * and the first joint."

Mrs. Hammontree further testified that at the suggestion of defendant's clerks she took the plaintiff to a near-by drugstore; that the druggist advised her to consult a doctor and that plaintiff was then taken to the office of Dr. Altomare; that X-ray pictures were taken of plaintiff's left ring finger; that the doctor showed her "the X-rays and pointed out where the fracture was." She stated, in effect, that at the time of the trial the tip of the finger was fixed in a semi-flexed position and that there had been almost a complete evulsion of the fingernail.

Mrs. Hammontree testified on cross-examination:

"The boys were with us when we went toward the back of the store. * * *.

"Q. Of course on this occasion you did not notice when he (plaintiff) left? A. No, I didn't.

"Q. You did see him at the front of the store? A. Yes.

"Q. You didn't know how long he had been there? A. Not in a certain length of minutes, no.

"Q. When you saw him he was playing with shoes and was standing at the south side of this doorway? A. No, he wasn't playing with anything, he was just looking.

"Q. Perhaps I am mistaken. * * * In your deposition page 15. (Reading:)

" 'Q. Did you look around for him? A. Yes. * * *

" 'Q. Where was Chet Leon standing when you saw him? A. He was stand-ing by the doors, on the south side of the doors looking out. Well, he was just playing there with shoes and then he was looking out at the people going along the sidewalk.'

"Q. Did you give that answer to that question? A. I don't remember saying he was playing with shoes. * * * He was looking at shoes. * * *

"Q. In any event, he was looking out on the sidewalk when you saw him there? A. Yes, he was looking out. * * *

"Q. You don't know how much later it was after Troy went to the front when you heard the scream? A. No, it was a very few minutes * * *."

Mrs. Lillian Roles, plaintiff's grandmother, testified in part:

"The oldest boy Troy Emery was standing beside me, the baby was holding on to his mother's coat when we went back to the back to sit down. * * *

"Q. When was your attention next called to either of the boys? A. Well, the next I remember I heard my daughter say something to the older one. In just a little bit I heard the little one scream. * * * He was up toward the front of the store. * * * I was so scared I started to get up, I dropped my package and pocketbook, I leaned over to pick them up, by that time the older boy had started back toward me. I saw my daughter had the younger boy, I went on up and met the older boy, he said, 'Grandma, * * *.' * * *.

"Q. What you started to say there, did that happen immediately after you heard the scream? A. Yes. * * *

"Q. What did the older boy Troy say to you when you went up to meet him? A. He said, 'Grandma, baby brother has his hand cut off.' * * * Troy stayed with me while I walked on back a few steps to finish picking up

the packages, then we started on up towards the front of the store. * * *

"Q. What did he (Troy) do? By that I mean not what words he said, what did he do? A. As we were going up he had hold of my hand, he pulled me over to the door and pointed to a spot on the door.

"Q. Did you investigate the spot? A. Yes, I took this finger, rubbed down on it. * * * It was fresh blood.

"Q. Can you tell the jury where on these pictures the spot appeared? You can use defendant's Exhibit 5 (a photograph of the south door and south panel). A. Of course I don't know how I would say—right around in here is about the height of a baby's head (indicating). * * * I have no idea of the scale of this door, I would say it was about along in here where the baby's head would be (indicating).

"Q. It was between the glass door and this glass panel (indicating)? A. Yes, along here (indicating)."

Mrs. Roles testified on cross-examination:

"Q. You didn't know Chet had gone until you heard the scream? A. No.

"Q. You didn't know how long you had been in the store when you heard the scream? A. No. I know it wasn't very long. * * *

"Q. You don't know how long Chet had been at the front of the store? A. No. * * *

"Q. You hadn't seen either of your grandchildren at the door at any time? A. No, sir."

Plaintiff-appellant contends that the trial court erred in setting aside the verdict and judgment and rendering judgment for defendant company in accordance with its previous motion for a directed verdict, because the evidence was sufficient to warrant the submission of the case to the jury.

While the petition contained several charges of negligence, the action of the trial court in sustaining defendant's after-trial motion for judgment and rendering judgment for defendant "will be adjudged on appeal only with reference to the sufficiency of the evidence on the issues submitted." Guthrie v. City of St. Charles, 347 Mo. 1175, 1184, 152 S.W.2d 91, 94. If no case was made on the issue or issues submitted to the jury, then the judgment for defendant must be affirmed. In determining this question, we must, of course, view the evidence in the light most favorable to plaintiff. Negligence is ordinarily a question for the jury. It is always so when the evidence on material points is conflicting, or where, the facts being undisputed, different minds might reasonably draw different conclusions therefrom. Gratiot v. Missouri Pacific Ry. Co., 116 Mo. 450, 466, 21 S.W. 1094, 1098, 16 L.R.A. 189. An after-trial motion for judgment should be sustained on the ground that the plaintiff failed to make a submissible case only when the evidence and the inferences reasonably to be drawn therefrom are so strongly against plaintiff as to leave no room for reasonable minds to differ on the issues submitted to the jury.

Plaintiff submitted the case, by his main instruction, upon the theory "that while the plaintiff was standing near the entrance door on the inside of said store, he placed his left hand on a glass door there maintained by the defendant and that the plaintiff's left hand and fingers were caught between the south half of said glass door and the door jamb when said door was moved and * * * that the defendant carelessly and negligently maintained said door and jamb in such a manner that when said door was closed said door and jamb had the appearance of one solid piece of glass when actually said door and jamb consisted of two parts, one of which was movable and the other not movable and when said door was moved a space was suddenly created between said door and jamb, and that defendant carelessly and negligently failed to warn the plaintiff or his mother of the danger (if any) of plaintiff placing his hand

on said door and jamb, and * * * that as a direct result thereof the plaintiff was injured * * *."

■■ It is unquestioned that plaintiff's status at the time of the accident was that of an invitee or business visitor. Graves v. May Department Stores Co., Mo.App., 153 S.W.2d 778; Miller v. George B. Peck Dry Goods Co., 104 Mo.App. 609, 78 S.W. 682; 65 C.J.S., Negligence, § 43 (4), p. 518; 2 Restatement of the Law of Torts, sec. 332 (d), p. 900. The law governing the liability of storekeepers and other possessors of land to business visitors is clearly set forth in 2 Restatement of the Law of Torts, sec. 343, p. 938, as follows: "A possessor of land is subject to liability for bodily harm caused to business visitors by a natural or artificial condition thereon if, but only if, he (a) knows, or by the exercise of reasonable care could discover, the condition which, if known to him, he should realize as involving an unreasonable risk to them, and (b) has no reason to believe that they will discover the condition or realize the risk involved therein, and (c) invites or permits them to enter or remain upon the land without exercising reasonable care (i) to make the condition reasonably safe, or (ii) to give a warning adequate to enable them to avoid the harm without relinquishing any of the services which they are entitled to receive, if the possessor is a public utility." This statement of the law has been approved by our Supreme Court. Summa v. Morgan Real Estate Co., 350 Mo. 205, 210, 165 S.W.2d 390, 391; Devine v. Kroger Grocery & Baking Co., 349 Mo. 621, 633, 162 S.W.2d 813, 818; Hudson v. Kansas City Baseball Club, Inc., 349 Mo. 1215, 1220, 164 S.W.2d 318, 320, 142 A.L.R. 858. See also McElroy v. S. S. Kresge Co., Mo.App., 244 S.W.2d 425, 426; 65 C.J.S., Negligence, § 45, p. 521 et seq.

■ A business visitor "is entitled to expect that the possessor will take reasonable care to discover the actual condition of the premises and either make them safe or warn him of dangerous conditions. * * * A possessor who holds his land open to others for his own business pur-

poses, must possess and exercise a knowledge of the dangerous qualities of the place itself and the appliances provided therein, which is not required of his patrons." 2 Restatement of the Law of Torts, sec. 343, Comments a and f, pp. 939 and 944. However, a storekeeper or other land occupier is not an insurer of the safety of his business visitors. Schmoll v. National Shirt Shops of Missouri, 354 Mo. 1164, 1170, 193 S.W.2d 605, 608. As stated in Hudson v. Kansas City Baseball Club, Inc., supra, 164 S.W.2d 318, 321, the "invitor is not an insurer of the safety of the invitee; neither is the invitee protected against all hazard, nor relieved of all duty to himself for his own safety. And to the extent that the duty of self-protection rests upon the invitee, the duty of the invitor to protect is reduced. The extent of these relative duties depends upon many factors involving the capacity and opportunity of the invitor to protect the invitee and the capacity and opportunity of the invitee to protect himself.' Ivory v. Cincinnati Baseball Club Co., 62 Ohio App. 514, 518, 24 N.E.2d 837, 839." See also, Howell v. Kroger Grocery & Baking Co., Mo.App., 178 S.W.2d 101, 104.

■ One of the factors affecting the care to be exercised by the invitor may be the age of the invitee. The care and caution expected and required of a child are measured by its capacity to appreciate and avoid dangerous conditions. Turner v. City of Moberly, 224 Mo.App. 683, 684, 26 S.W.2d 997. A reasonable person is expected to know this and to govern his actions accordingly. Hence a storekeeper who invites or induces children to come upon the premises is under a duty to take whatever precautions ordinary care would dictate to protect the children from any dangerous conditions or instrumentalities he maintains on the premises, including conditions or instrumentalities which are likely to attract them and subject them to dangers which a reasonably prudent person would anticipate. Graves v. May Department Stores Co., Mo.App., 153 S.W.2d 778; Jablonski v. May Department Stores Co., Mo.App., 153 S.W.2d 786; Hillerbrand v. May Mercantile Co., 141 Mo.App. 122,

121 S.W. 326; 65 C.J.S., Negligence, §§ 12, 52, 66, pp. 400, 548, 558; 38 Am.Jur., Negligence, secs. 40, 137, pp. 685, 798; 162 A. L.R. 949, 963. The known propensities of children, as well as the nature of the dangerous condition, must be taken into consideration in determining whether ordinary or reasonable care for the safety of a child has been exercised in a particular case. See cases last cited. Since "ordinary care" is a relative term, the standard by which it is to be measured varies with the circumstances of each case. Howell v. Kroger Grocery & Baking Co., supra. Thus, there may be a duty to taken precautions with respect to children of tender years which would not be necessary in the case of adults or children who have reached an age when they are able to appreciate and avoid danger. Kemp v. Doe Run Lead Co., Mo.App., 57 S.W.2d 758, 761.

 As heretofore stated, a storekeeper or other land occupier is not the insurer of the safety of a person whom he has invited to enter the premises. His liability to such a person for injuries not intentionally inflicted must be predicated upon negligence. "Negligence which imposes liability must result from a faulty or defective foresight. [Not hindsight.] * * * on what should have been anticipated, rather than what happened." McCollum v. Winnwood Amusement Co., 332 Mo. 779, 787, 59 S.W.2d 693, 697. Hughes v. St. Louis Nat. League Baseball Club, Inc., 359 Mo. 993, 1001, 224 S.W.2d 989, 995, 16 A.L.R.2d 904; Dickinson v. Eden Theatre Co., 360 Mo. 941, 947, 231 S.W.2d 609, 612. See also, Graves v. May Department Stores Co., supra, 153 S.W.2d 778, 784. In Zuber v. Clarkson Const. Co., 363 Mo. 352, 357, 251 S.W.2d 52, 55, the court said: "Relating to those dangers to be reasonably anticipated—if there is some probability or likelihood, not a mere possibility, of harm sufficiently serious that ordinary men would take precautions to avoid it, then the failure to do so is negligence. While the likelihood of a future happening is the test of a duty to anticipate, this does not mean the chances in favor of the happening must exceed those against it. The test is not the balance of probabilities, but of the existence of some probability of sufficient moment to induce the reasonable mind to take the precautions which would avoid it." (Citing cases.)

In the instant case, plaintiff-appellant cites Graves v. May Department Stores Co., supra; Jablonski v. May Department Stores Co., supra; Reynolds v. May Department Stores Co., 8 Cir., 127 F.2d 396; Hillerbrand v. May Mercantile Co., supra. In each of these cases the plaintiff-invitee was a child of tender years. In the first three cases the child was injured when his fingers were caught between the comb plate of an escalator and the moving steps, and it was held in each case that the evidence was sufficient to warrant the jury in finding that the defendant was negligent. In the Graves case the child's fingers were caught between the comb plate and the steps when he stooped over to pick up a piece of paper. It was held, in the Hillerbrand case, that the defendant was liable for injuries to a small child who put its hand in the boxing covering the gears operating the endless chain forming the bannister of an escalator. Plaintiff also cites Miller v. George B. Peck Dry Goods Co., 104 Mo.App. 609, 78 S.W. 682 (plaintiff a small child); Howell v. Kroger Grocery & Baking Co., supra; Shortridge v. Scarritt Estate Co., 145 Mo. App. 295, 130 S.W. 126, where plaintiff, a boy eleven and a half years old, wandered to an elevator shaft which was guarded by doors in which the glass panels were not yet inserted, put his head in the opening left for one of the panels, and was struck by the elevator; held, the question of defendant's negligence, and the question of plaintiff's negligence were for the jury. Since the theory upon which the plaintiff herein submitted his case to the jury is disclosed by his main instruction, we do not deem it necessary to summarize the argument in his brief.

Defendant cites Wiedanz v. May Department Stores Co., Mo.App., 156 S.W.2d 44 (revolving door case, plaintiff an adult); Stein v. Buckingham Realty Co., Mo.App., 60 S.W.2d 712 (where plaintiff, an adult, fell on hotel stairway); Dolan v. Callender, McAuslan & Troup Co., 26 R.I. 198, 58 A.

665 (swinging door case, plaintiff twelve years of age) ; Jacob v. City of Pittsburgh, 330 Pa. 587, 198 A. 639 (swinging door case, plaintiff nine years of age) ; Simons v. Dole Valve Co., 288 Ill.App. 288, 6 N.E.2d 318 (attractive nuisance case). Defendant's cases are readily distinguishable from the case at bar. In fact, neither party has cited any cases in which the facts are like those in the present case, and we have found none.

Although plaintiff's mother and grandmother did not see the accident, we think there was evidence from which it could be reasonably inferred that while plaintiff was standing inside the store and near the front doorway, he placed his left hand on the south door or the south panel or jamb, at or near the narrow clearance space between the door and the panel, and that when the door was moved, his finger slipped into the space between the door and the panel where it was caught and injured. This is not disputed by defendant.

In support of the contention that there was no evidence of negligence on defendant's part, defendant argues that "it might be inferred from (the evidence) that plaintiff's finger was caught between the door and the jamb, but that inference cannot be used as a factual basis to infer that * * * he was attracted to the door by the glass and, by reason thereof, placed his hand in the opening." Defendant does not mean that plaintiff sought to recover under the attractive nuisance doctrine. Counsel for plaintiff is careful to point out in his written argument that plaintiff was an invitee on defendant's premises, not a trespasser, and therefore was not required to prove as an essential element of his case that he was attracted to the premises by the glass door and panels and that they were inherently dangerous. As heretofore stated the rule here applicable is that requiring ordinary care to make the premises safe for invitees or to warn them of potentially dangerous conditions, as qualified by the further rule that where the invitees are children special caution is necessary. While it is stated in plaintiff's brief that defendant should have anticipated that such children "would be attracted to the large exposure of glass at the front of the store as a vantage point from which to view the activity on the sidewalk and street," the plaintiff's main instruction did not require the jury to find as a condition to a verdict for plaintiff that plaintiff "was attracted" to the doorway by the glass doors and panels.

██ As appears above, the instruction did require the jury to find "that the defendant carelessly and negligently maintained said door and jamb in such manner that when said door was closed said door and jamb had the appearance of one solid piece of glass when actually said door and jamb consisted of two parts, one of which was movable and the other not movable and when said door was moved a space was suddenly created between said door and jamb, and that defendant negligently failed to warn plaintiff or his mother of the danger (if any) of placing his hand on said door * * *." Defendant states that there was no evidence to show that the south door and south panel or jamb "had the appearance of a solid piece of glass." It is true, as defendant points out, that the photographs in evidence show the clearance spaces heretofore mentioned, but they were very narrow. Considering the age of the plaintiff, we think the question was one for the jury to decide.

Defendant further contends that the maintenance of an ordinary swinging door is not an act of negligence; that there was no evidence that the door was inherently dangerous and no showing of any negligence in the maintenance and operation of the door; that such doors are in common use and the fact that they are constructed of glass does not make them dangerous.

██ It is well settled that the maintenance of a swinging door is not in itself an act of negligence. Ordinarily, in order to recover for injuries attributable in some way to a swinging door, it is necessary to show some dangerous condition in the construction or position of the door or some act or omission on the part of the owner or occupant of the premises which subjected a person lawfully on the premises to injury

in the use of the door. In the instant case there was no evidence of any defect in the construction or the condition of the door in question, nor was there any evidence of negligence on the part of defendant in the operation of the door, but it does not necessarily follow that there was no actionable negligence on the part of defendant.

■ As stated, no contention is made that plaintiff was not a business invitee on the premises. We think it could be reasonably found that an ordinarily prudent person, in the position of defendant, would have thought of the likelihood of small children being brought into the retail store by their parents and allowed to move about the store while their parents were engaged in business matters. In our opinion the evidence was sufficient to justify a finding that a reasonably prudent person, exercising ordinary care to keep the store and the instrumentalities therein in a reasonably safe condition, would have anticipated that a child of tender years might go to the front of the store and put his hand on one of the glass doors or panels and be injured by getting its hand or fingers caught between the door and the panel when the door was moved by some person entering or leaving the store, and in the exercise of such care would have made the condition reasonably safe or given a warning adequate to protect the child. If the plaintiff herein rested his hand on the door or panel while looking out on the street, as the evidence tended to show, his action was such as might be anticipated as probable in the case of a child one and a half years of age. Obviously, a child of that age could not be expected to know that the door was movable and the panel or jamb immovable, or to appreciate the risk involved when he placed his hand against the door or panel.

We cannot say that the facts in evidence and the inferences reasonably to be drawn therefrom are so strongly against plaintiff as to leave no room for reasonable minds to differ. It follows that the judgment for defendant should be reversed and the cause remanded with' directions to reinstate the verdict and to enter judgment for plaintiff in accordance with the verdict. The commissioner so recommends.

SPERRY, C., concurs.

PER CURIAM.

The foregoing opinion of BOUR, C., is adopted as the opinion of the court. The judgment is reversed and the cause remanded with directions as recommended by the commissioner.

All concur.